UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

KEVIN RIDEOUT,

          Plaintiff,

v.

CASHCALL, INC.,

          Defendant.

Case No. 2:16-cv-02817-RFB-VCF

**ORDER**

**Defendant's Motion to Dismiss, or, in the Alternative, Motion for Stay and to Compel Arbitration**

### I. INTRODUCTION

Before the Court is Defendant CashCall, Inc. ("Defendant" or "CashCall")'s Motion to Dismiss, or, in the Alternative, Motion to Stay and to Compel Arbitration. (ECF No. 6). For the reasons stated below, the Court DENIES Defendant's Motion.

### II. BACKGROUND

Plaintiff Kevin Rideout ("Rideout" or "Plaintiff") filed a Complaint with Jury Demand against Defendant on December 7, 2016. (ECF No. 1). Plaintiff alleges violations of Nevada Revised Statues Chapter 604A.010 et seq. ("NRS 604A"), which incorporates the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692a to 1692j ("FDCPA"), as well as negligent and knowing and/or willful violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"). CashCall filed the instant Motion to Dismiss, or alternatively, Motion to Stay and Compel Arbitration, on February 3, 2017. (ECF No. 6). On February 8, 2017, Plaintiff filed his Response. (ECF No. 8). Defendant filed its Reply to Plaintiff's Response on February 27, 2017. (ECF No. 14). Magistrate Judge Cam Ferenbach entered a Scheduling Order on October 30, 2017.

(ECF No. 25). Discovery was stayed pending the Court's order on the instant motion. (ECF No. 28).

On August 30, 2017, the Court held a hearing on the Defendant's Motion. The Court ordered the parties to submit supplemental briefing on the issue of whether the Court, if it decided that the disputed arbitration clause was enforceable, had the authority to require the arbitrator to apply federal law. Both Plaintiff and Defendant submitted their Supplemental Briefs on September 6, 2017. (ECF Nos. 20, 21).

### III. FACTUAL ALLEGATIONS
#### a. CashCall's Debt Collection Practices

The following factual allegations are taken from Plaintiff's Complaint. Plaintiff obtained a high interest loan with CashCall in the amount of $2500 ("the Debt") and dutifully maintained payments on the Debt. Plaintiff ultimately repaid over $10,000 in interest and principal payments on the Debt. After repaying the Debt, a representative at CashCall informed Plaintiff that the Debt was paid in full and he owed no further obligations to CashCall.

However, in September 2015, CashCall began to call Plaintiff to collect payment on the Debt. During the collection phone calls, CashCall informed Plaintiff that the Debt was in default and demanded payment. CashCall also called Plaintiff's wife and children to collect payment on the Debt. CashCall called Plaintiff, his wife, and his children regularly and multiple times per day on a daily basis. CashCall called Plaintiff from various numbers, including but not limited to: 1-844-302-2274; 1-267-885-2219 and 1-626-389-3322. CashCall called Plaintiff's cellular phone ending "9116" and landline ending "8785". CashCall also called Plaintiff before 9:00 a.m. PST and after 9:00 PM on numerous occasions to collect the Debt.

CashCall continued to call Plaintiff, Plaintiff's wife and Plaintiff's children despite Plaintiff disputing he owed any further payments on the Debt, informing CashCall that he repaid the Debt in full, and requesting that the calls cease. However, CashCall disregarded Plaintiff's requests and continued to call Plaintiff on his cellular phone and landline regularly to collect the Debt. CashCall also continued to call Plaintiff's wife and children to collect the Debt.

On several occasions, but no later than in January 2016, during a phone conversation, Plaintiff demanded that CashCall cease contacting him to collect payment on the Debt. However, CashCall continued to place collection calls to Plaintiff and his family members to collect the Debt.

Plaintiff alleges that he has suffered and continues to suffer actual damages as a result of CashCall's unlawful conduct. Further, Plaintiff claims that CashCall's actions at all times herein were "willful." As a direct consequence of CashCall's harassing phone calls, acts, practices and conduct, the Plaintiff suffered and continues to suffer from anger, anxiety, emotional distress, frustration, rage, headaches, an upset stomach, heart palpitations, and has otherwise been totally annoyed by CashCall's intrusive and illegal collection efforts. Plaintiff has also lost the use of personal and family time while enduring these frustrations.

### b. The Underlying Loan Agreement

The following facts are taken from the Motion to Dismiss and attached Exhibits. Plaintiff borrowed $2500 from Western Sky Financial, LLC ("Western Sky"), an internet loan provider.[1] To obtain the loan, Plaintiff signed the Western Sky Consumer Loan Agreement ("Loan Agreement"). (ECF No. 6-1 at 5-10). The Loan Agreement contains what Defendant describes as an "explicit, reader-friendly, and extensive arbitration clause." (ECF No. 6 at 2). The Court incorporates by reference the Loan Agreement. Relevant provisions from the Loan Agreement are set forth below:

- "Unless you exercise your right to opt-out of arbitration in the manner described below, any dispute you have with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration." (ECF No. 6-1 at 7).
- "You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." (ECF No. 6-1 at 8.)
- Arbitration is a means of having an independent third party resolve a Dispute. A 'Dispute' is any controversy or claim between you [the Borrower] and Western Sky or the holder or servicer of the Note. The term Dispute is to be given its broadest possible meaning . . . . A Dispute includes, by way of example and without limitation, any claim based upon marketing or solicitations to obtain the loan and

---

[1] The Loan Agreement states that the amount financed to Plaintiff was $2,525.00. (ECF No. 6-1 at 5).

- 3 -

the handling of or servicing of [the Borrower's] account . . . . For purposes of this Arbitration agreement, the term 'the holder' shall include Western Sky or the then-current note holder's employees, officers, directors, attorneys, affiliated companies, predecessors, and assigns, as well as any marketing, servicing, and collection representatives and agents." (ECF No. 6-1 at 8).

- "Regardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association [,] . . . JAMS [,]. . . or an arbitration organization agreed upon by you and the other parties to the Dispute. The arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate, including the limitations on the Arbitrator below." (ECF No. 6-1 at 8).
- "THIS ARBITRATION PROVISION IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE CHEYENNE RIVER SIOUX TRIBE. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." (ECF No. 6-1 at 9).
- "In the event you opt out of Arbitration, any disputes hereunder shall nonetheless be governed under the laws of the Cheyenne River Sioux Tribal Nation." (ECF No. 6-1 at 9).

On August 18, 2012, Western Sky sold its interest in Plaintiff's loan to WS Funding, LLC, a wholly-owned subsidiary of CashCall. Following the sale, CashCall sent Plaintiff a Notice of Assignment, Sale or Transfer of Servicing Rights, in which CashCall notified Plaintiff that Western Sky sold his loan to WS Funding and that CashCall would service the loan. (ECF No. 6-1 at 12).

### IV. LEGAL STANDARD

#### a. Enforcement of Arbitration Clauses

##### i. *Federal Law*

The Federal Arbitration Act ("FAA") provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA provides two methods for enforcing arbitration: (1) an order compelling arbitration of a dispute; and (2) a stay of pending

litigation raising a dispute referable to arbitration. 9 U.S.C §§ 3, 4.

"By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985). The FAA limits the district court's role to determining (1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement to arbitrate encompasses the claims at issue. Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014). "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ." Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp., 460 U.S. 1, 24-25 (1983). Thus, "[t]he standard for demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an arbitration motion, since the Act is phrased in mandatory terms." Republic of Nicar. v. Std. Fruit Co., 937 F.2d 469, 475 (9th Cir. 1991). However, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) (quoting United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)).

The determination of whether a particular issue should be determined by the arbitrator rather than the court is governed by federal law. Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1130 (9th Cir. 2000). However, when deciding whether the parties agreed to arbitrate a certain matter, courts generally apply ordinary state law principles of contract interpretation. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

Importantly, the Supreme Court has reiterated that arbitration clauses cannot effect a "substantive waiver of federally protected civil rights." 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 273 (2009). That is because "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985).

Arbitration agreements may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability. Rent-A-Ctr., West, Inc. v. Jackson, 561 U.S. 63, 68 (2010) (citation omitted). Unconscionability, as a generally applicable contract defense, is governed by state law. Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931, 939 (9th Cir. 2001). In Ticknor, the Ninth Circuit held that the FAA does not preempt state law governing the unconscionability of adhesion contracts. Id. at 935. When evaluating unconscionability, federal courts must "approximate state law as closely as possible" and be bound by the pronouncements of the state's highest court. Id. at 939 (citations omitted). "Federal courts sitting in diversity look to the law of the forum state in making a choice of law determination." Id. at 937 (citation omitted).

### ii. *State Law*

Although public policy favors enforcing arbitration clauses under Nevada law, courts may invalidate arbitration provisions as unconscionable. D.R. Horton, Inc. v. Green, 96 P.3d 1159, 1162 (Nev. 2004). "'Generally, both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a . . . clause as unconscionable.' However, less evidence of substantive unconscionability is required in cases involving great procedural unconscionability." Id. (citations omitted). "A clause is procedurally unconscionable when a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract, or because the clause and its effects are not readily ascertainable upon a review of the contract. Procedural unconscionability often involves the use of fine print or complicated, incomplete or misleading language that fails to inform a reasonable person of the contractual language's consequences." Id. In terms of substantive unconscionability, the Nevada Supreme Court has adopted the formulation of the inquiry used by the Ninth Circuit and explains that "where an arbitration agreement is concerned, the agreement is unconscionable unless the arbitration remedy contains a 'modicum of bilaterality.'" Id. at 1165 (quoting Ting v. AT&T, 319 F.3d 1126, 1149 (9th Cir.), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003)).

### b. **Motion to Dismiss an Arbitrable Action**

Section 3 of the FAA provides for a stay of legal proceedings whenever the issues in a case are within the reach of an arbitration agreement. 9 U.S.C. § 3. Although the statutory language

supports a mandatory stay, the Ninth Circuit has interpreted this provision to allow a district court to dismiss the action. See Sparling v. Hoffman Const. Co., 864 F.2d 635, 638 (9th Cir. 1988). A request for a stay is not mandatory. Martin Marietta Aluminum, Inc. v. Gen. Elec. Co., 586 F.2d 143, 147 (9th Cir. 1978).

## V. DISCUSSION

### a. Unenforceability For Substantive Waiver of Federal Statutory Rights

CashCall first argues that when Plaintiff obtained his loan, he agreed to arbitrate any disputes. CashCall contends that, because Plaintiff entered into a contract with Western Sky – namely, the Loan Agreement – and the contract contains an extensive arbitration provision, a valid agreement therefore exists.

Plaintiff argues in response that there is no evidence that Plaintiff ever signed, reviewed, or consented to the Loan Agreement. Plaintiff also argues that the Loan Agreement is inadmissible hearsay. However, the Court rejects these arguments, as Plaintiff does not dispute that he obtained the loan from Western Sky – throughout his Complaint, he readily admits that he obtained the Debt and made payments on the Debt. (ECF No. 1 at 3-4).

Plaintiff additionally argues that the Loan Agreement should be invalidated as unenforceable and unconscionable, thereby preventing a finding of agreement to arbitrate. He cites two nonbinding circuit court cases in support of his argument – Hayes v. Delbert Services Corporation, 811 F.3d 666 (4th Cir. 2016) and Jackson v. PayDay Financial, LLC, 764 F.3d 765 (7th Cir. 2014).[2] In Hayes, a class of plaintiffs who received payday loans from Western Sky sued for violations of the FDCPA and TCPA. The plaintiffs signed loan agreements with Western Sky that included arbitration clauses similar to the one at issue here. Defendant loan servicer, who was assigned the loans at issue, moved to compel arbitration under the FAA. The

---

[2] The Third Circuit, since the filing of the parties' submissions, has also recently held this same arbitration clause to be unenforceable for offering an illusory arbitral forum. MacDonald v. CashCall, Inc., 2018 U.S. App. LEXIS 4795, (3d Cir. Feb. 27, 2018). The Court finds that this would be a separate basis to invalidate the clause in this case for the same reasons noted in MacDonald. Id. at *11-18, but the Court does not reach this analysis since the Court will invalidate the arbitration provisions on other grounds.

- 7 -

district court granted the motion. The Fourth Circuit reversed, and found that "[t]his arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to the plaintiffs' federal claims." Hayes, 811 F.3d at 673.[3] "With one hand, the arbitration agreement offers an alternative dispute resolution procedure in which aggrieved persons may bring their claims, and with the other, it proceeds to take those very claims away." Id. at 673-74. The Fourth Circuit also found that the arbitration agreement's choice-of-law provisions could not be severed from the rest of the arbitration agreement. The Court cited to a Ninth Circuit case, which held: "It is a well-known principle in contract law that a clause cannot be severed from a contract when it is an integrated part of the contract." Graham Oil Co. v. ARCO Prod. Co., a Div. of Atl. Richfield Co., 43 F.3d 1244, 1248 (9th Cir. 1994), as amended (Mar. 13, 1995). The flawed provisions could not be severed because "the offending provisions go to the core of the arbitration agreement." Hayes, 811 F.3d at 676. Further, the Fourth Circuit found that the overall loan agreement was problematic in light of the arbitration agreement, given that neither state nor federal law applied under the terms of the loan agreement. Id. at 673-74.

The facts in Jackson are slightly different than in Hayes and the instant case. There, plaintiffs litigated a Western Sky Loan Agreement with arbitration provisions that required all litigation to be conducted by a Cheyenne River Sioux tribal court and arbitrations to be done on the reservation. 764 F.3d at 769. Additionally, plaintiffs asserted state rather than federal causes of action. Id. The Seventh Circuit had previously remanded to the district court to determine 1) whether tribal law was readily available to the public, and 2) whether the Cheyenne River Sioux has an arbitrator and arbitration method actually available to the public. Id. at 770. While evidence was presented to show that tribal law was available to the public, the Court found that other evidence revealed that the arbitration mechanism was "a sham and an illusion" – for example, the arbitrator selected in one case was selected by the owner of Western Sky, and like

---

[3] The Fourth Circuit also noted: "while Western Sky was a tribal-owned entity, [defendant loan servicer] is not." This Court recognizes that CashCall also appears to not be a tribal-owned entity, and does not dispute this fact in any of its briefing. (See ECF No. 6-1 at 12) (listing CashCall's address for customer service inquiries and payment processing as located in Anaheim, CA).

Western Sky's owner, was a member of the Cheyenne River Sioux. Id. The Court determined that the loan agreement's forum selection clause was unreasonable because no such forum existed. The loan agreement provided for arbitration conducted by the Cheyenne River Sioux – but "[t]he Cheyenne River Sioux Tribe 'does not authorize Arbitration,' it 'does not involve itself in the hiring of . . . arbitrator[s],' and it does not have consumer dispute rules." Id. at 776 (alterations in original) (footnotes omitted). The Court also found the arbitration provision procedurally and substantively unconscionable under Illinois law. Id. at 778. Further, the Seventh Circuit found that exhaustion in tribal court was not required, as defendants had not established a colorable claim of tribal jurisdiction. Id. at 781-86.

CashCall argues that the Court is not bound by the Fourth Circuit's decision in Hayes, but makes no substantive arguments about the case. CashCall additionally attempts to distinguish Jackson, arguing that a different arbitration provision applied in that case, but it does not dispute the Seventh Circuit's finding that Cheyenne River Sioux law does not have consumer dispute rules or analogous rights for consumers. The Court agrees that the Loan Agreement at issue here purportedly authorizes arbitration before the AAA or JAMS. (ECF No. 6-1 at 8). The Court also notes that, unlike the arbitration provision at issue in Jackson, the arbitration provision here permits Plaintiff to select to arbitrate within 30 miles of his home. (ECF No. 6-1 at 8). However, the Loan Agreement nonetheless states that "[t]he arbitration will be governed by the chosen arbitration organization's rules and procedures applicable to consumer disputes, *to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate*." (ECF No. 6-1 at 8) (emphasis added). The Loan Agreement continues: "Any arbitration under this Agreement may be conducted either on tribal land or within thirty miles of your residence, at your choice, provided that this accommodation for you shall not be construed in any way (a) as a relinquishment or waiver of the Cheyenne River Sioux Tribe's sovereign status or immunity, or (b) to allow for the application of any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement." (ECF No. 6-1 at 8). In a few sections above that language, the Loan Agreement provides: "You [the Borrower] agree that any Dispute, except as provided below, will be resolved by Arbitration, *which shall be conducted by*

*the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this agreement.*" (ECF No. 6-1 at 8). The Court thus finds that the Loan Agreement does not by its plain terms permit the application of any law as to permissible claims or the process for resolving disputes for such claims except that of the Cheyenne River Sioux. The Court further finds that CashCall has presented no evidence that such an arbitral forum exists under Cheyenne River Sioux law. See MacDonald, 2018 U.S. App LEXIS 4795, at *11-12 (noting lack of such an arbitral forum); Hayes, 811 F.3d 672-73 (accord).

The Court agrees with the reasoning of the court in Hayes and finds that the arbitration provisions in the Loan Agreement are unenforceable because the Loan Agreement's terms effect a waiver of substantive federal statutory rights by requiring that the arbitration apply Cheyenne River Sioux law. The Cheyenne River Sioux Tribal Constitution does not incorporate federal statutes or the rights conferred upon individuals by such statutes. See Cheyenne River Sioux Tribe Constitution (approved Dec. 27, 1936), https://www.loc.gov/law/help/american-indian-consts/PDF/36026282.pdf. CashCall acknowledges that the statutory rights conferred upon the Plaintiff by the TCPA and FDCPA do not exist under Cheyenne River Sioux law and it could not identify analogous rights that would exist. Indeed, the Agreement has chosen the only type of forum—tribal law—that exists in all states that could effect a waiver of federal statutory rights. See generally Plains Commerce Bank v. Long Family Land & Cattle Co., 554 U.S. 316 (2008) (explaining that "tribal sovereignty, it should be remembered, is a sovereignty outside the basic structure of the Constitution.") (citations omitted). The Court finds, however, that Congress did not intend for the FAA to be used as a means "to waive all of a potential claimant's federal rights." Hayes, 811 F.3d at 675. As the Fourth Circuit aptly stated: "A party to an arbitration agreement may of course agree to waive certain rights as part of that agreement. . . . But a party may not underhandedly convert a choice of law clause into a choice of no law clause—it may not flatly and categorically renounce the authority of the federal statutes to which it is and must remain subject." Id. The Court therefore finds the arbitration provisions in the Loan Agreement unenforceable and contrary to law, as Plaintiff cannot, based upon the facts of this case, waive substantive federal

rights through a choice of law or forum selection clause. <u>Mitsubishi Motors Corp.</u>, 473 U.S. at 628.

CashCall seeks to overcome this obvious legal impediment by unilaterally "stipulating" in its supplemental submission to the adjudication of these federal statutory rights in an arbitral forum governed by Cheyenne River Sioux law. Such a stipulation is farcical. First, the arbitrator acting under Cheyenne River Sioux law would be under no obligation to follow such a stipulation and actually could not pursuant to the contract which requires the application of Cheyenne River Sioux consumer dispute rules (which do not appear to exist) and law. Second, and more importantly, the Court does not find the clause to be severable as suggested by the proposed stipulation; CashCall cannot unilaterally and retroactively decide what portions of a contract may be enforced.

The Court therefore finds the arbitration clause unenforceable because it seeks to effect a prospective waiver of federal statutory rights.

### b. Unconscionability Under Nevada Law

Plaintiff separately contends that the Loan Agreement is procedurally and substantively unconscionable, preventing a finding that the parties agreed to arbitrate. The Court agrees.

#### *i. Procedural Unconscionability*

Plaintiff contends that the Loan Agreement is procedurally unconscionable because it was not possible for him to "ascertain the dispute resolution processes and rules to which he was agreeing" when he signed the Loan Agreement which included the arbitration provisions. CashCall argues that the arbitration provisions were not hidden – rather, they were "set off by a separate heading in bold and all capitals" and there was a clause in close proximity to the signature line. (ECF No. 14 at 9-10). Additionally, CashCall contends that having an opt-out provision supports its position that the arbitration provisions are not procedurally unconscionable.

The Court agrees that the arbitration provisions were identified in the Loan Agreement. However, the standard for procedural unconscionability under Nevada law also requires examination of the effect of an arbitration clause (and related provisions) and whether an individual could readily ascertain the effect(s) of the arbitration clause. The Court finds that the effect of the arbitration clause—the elimination of a consumer's ability to vindicate his federal statutory rights

and the inapplicability of federal constitutional protections for fairness—could not be readily ascertained by the Plaintiff. The Plaintiff could not have reasonably ascertained and agreed to arbitrate his disputes in a forum that does not offer the fundamental protections for fairness in a judicial or arbitral proceeding. See generally Plains Commerce Bank, 554 U.S. 316 (2008) (explaining that "tribal sovereignty, it should be remembered, is a sovereignty outside the basic structure of the Constitution."). The Court finds that an average person would not be familiar with unique sovereignty of tribal law in relation to state and federal law. That is to say that the Court finds that an average person untrained in the law would not know that, by agreeing to tribal law as the choice of law, he or she was agreeing to completely abandon all possible federal and state statutory claims (such as those under the TCPA or NRS 604A) and also abandon any federal and state due process protections associated with the adjudication of such rights.

The opt-out clause in this case does not alleviate the unconscionability of this contract. Under the Agreement, even if a party opts out of the arbitration provisions, the Loan Agreement explicitly states that any disputes are nonetheless subject to the laws of the Cheyenne River Sioux Tribal Nation. Thus, the opt-out provision does not remedy the problem, because it does not offer a true opportunity to choose to retain the ability to pursue the federal and state statutory rights outside of the limitations of the sovereign law of the Cheyenne River Sioux—where such statutory rights and procedural due process rights do not exist.

Again, CashCall's last minute effort to unilaterally "stipulate" that Plaintiff can continue to pursue his federal statutory claims in arbitration is unavailing. Even if Plaintiff selects an arbitrator from AAA or JAMS, and even if CashCall does not ask the arbitrator to apply Cheyenne Sioux Tribal Nation law, the plain language of the Loan Agreement requires the arbitrator to do so. The arbitration may be done in accordance with federal law and the procedures of the selected arbitration organization, <u>only</u> to the extent neither conflicts with Cheyenne River Sioux Tribal Nation law—which is to say, not at all. (See ECF No. 6-1 at 7) ("You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement."); (see also ECF No 6-1 at 8) ("The arbitration will be governed by the chosen

arbitration organization's rules and procedures applicable to consumer disputes, to the extent that those rules and procedures do not contradict either the law of the Cheyenne River Sioux Tribe or the express terms of this Agreement to Arbitrate . . . ."). The Court finds that this confusing sequence of conflicting phrases in the Agreement is meant to obscure to the consumer the fact that she or he is essentially waiving all of the protections and claims that might be available under federal law. Therefore, the Court finds that the arbitration provisions contained within the Loan Agreement "involve [ ] the use of . . . complicated, incomplete or misleading language that fails to inform a reasonable person of the contractual language's consequences" and therefore are procedurally unconscionable. D.R. Horton, 96 P.3d at 1162-63.

### ii. Substantive Unconscionability

Plaintiff argues that the arbitration provisions are substantively unconscionable because its terms are one-sided and therefore unfair. Plaintiff further argues that there was unequal bargaining power with regard to the choice of law for the overall Loan Agreement, and with regard to the arbitration provisions.

CashCall contends that there is no substantive unconscionability for two reasons: 1) because the Loan Agreement provides for arbitration before AAA or JAMS using the rules of those organizations, and 2) because by the terms of the Loan Agreement, CashCall will pay the filing fee and any costs or fees charged by the arbitrator. Additionally, CashCall relies again upon the opt-out clause.

As a preliminary matter, the Court finds that, given the severe degree of procedural unconscionability of the Loan Agreement in terms of its conflicting clauses and reliance on obscure law, less evidence of substantive unconscionability is required. D.B. Horton, 96 P.3d at 1162.

Nonetheless, the Court finds that there is substantive unconscionability and that such would be the case even if there was not significant procedural unconscionability. First, the very nature of the type of loan and its repayment terms reflect the extreme imbalance of bargaining leverage. Plaintiff obtained a loan for $2500 with a high interest rate, and paid over $10,000 in interest and principal payments. Second, the imbalance between the parties is reflected in the fact that the

terms of the contract were not subject to negotiation. CashCall has repeatedly reiterated that the contract was a standard agreement based upon a previous standard agreement which it had unilaterally modified over time. Third, the imbalance between the parties is reflected in the terms of the contract with respect to enforcement of its provisions. The Loan Agreement's apparent reliance on Cheyenne River Sioux law—which would, if enforced, provide the Defendant with significant relief from federal and state statutory causes of action and simultaneously strip the Plaintiff of both federal/state statutory remedies and federal procedural protections—further confirms the imbalance of power between the two contracting parties. Therefore, the Court finds that the Loan Agreement and its arbitration provisions are substantively unconscionable.

Because the Loan Agreement is both procedurally and substantively unconscionable, the Court finds that there is no valid or enforceable agreement to arbitrate. Based on the analysis above, the Court does not find any compelling reason to dismiss this case. As no valid agreement to arbitrate exists, the Court cannot find that the disputes raised are subject to arbitration.

## VI. CONCLUSION

Accordingly, Defendant's Motion to Dismiss, or, in the Alternative, Motion to Stay and to Compel Arbitration (ECF No. 6) is DENIED.

DATED this 7th day of March, 2018.

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**